**Robert D. MORRIS, Petitioner,**

*v.*

**COMMODITY FUTURES TRADING COMMISSION, Respondent,**

**Stotler and Company; S. Bruce Pattison; Stephen Greenfield, Intervenors.**

**No. 91–70427.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1992.

Decided Dec. 4, 1992.

---

Frank N. Masino, Morris, Taylor, Hays & Higaki, San Francisco, Cal., for petitioner.

Kathleen A. McDonough, Attorney, Commodity Futures Trading Com'n, Washington, D.C., for respondent.

Jeffry M. Henderson, Henderson & Becker, Chicago, Ill., for intervenors.

Before: GOODWIN, FARRIS, and PREGERSON, Circuit Judges.

GOODWIN, Circuit Judge:

Petitioner Robert D. Morris ("Morris") appeals the ruling of the Commodity Futures Trading Commission ("CFTC") reversing the initial decision of an Administrative Law Judge ("ALJ") which had awarded Morris $185,500.00 in damages for his reparations complaint against Respondents Stotler & Co., Stephen D. Greenfield, and Bruce Pattison (collectively "Respondents") for fraudulent inducement, unauthorized trading, churning and failure to supervise. Morris challenges the validity of the CFTC's ruling under the Administrative Procedures Act (A.P.A.), and the CFTC's findings that he failed to sustain his fraudulent inducement and churning claims. We affirm the CFTC's ruling.

## I. BACKGROUND

In 1983, Morris, a physician, was solicited by Respondent Stephen D. Greenfield, an employee of Respondent Bruce Pattison's investment company, to open a commodity futures account with Respondent Stotler & Co. Even though he had previously lost approximately $200,000.00 trading precious metals, Morris agreed to open a non-discretionary futures trading account at Stotler

& Co., with Greenfield acting as his account executive and Pattison supervising Greenfield's handling of the account. The activity in Morris' account involved trades in silver, gold and S & P stock index futures contracts. Morris lost more than $185,500.00, approximately $140,500.00 in trading losses and $45,000.00 in commissions over an eight month period. A few months after closing the account, Morris filed a reparations complaint with the CFTC alleging that Respondents fraudulently induced him into opening the account and then engaged in unauthorized trading, churning and failure to supervise the account.

ALJ George A. Painter issued an initial decision finding in favor of Morris and awarding damages of $185,500.00 plus interest. On appeal, the CFTC reversed the ALJ's findings of liability and dismissed Morris' complaint. Criticizing the "overall soundness" of the ALJ's factual determinations due to the nature and frequency of his errors, the CFTC decided to set aside its normal policy of deference in reviewing the decision of the ALJ. The CFTC found that the ALJ's misplaced preoccupation "with suspicious circumstances tangential to the dispute raised by the parties materially skewed his assessment of the parties' credibility." In explaining its decision to engage in an independent review of the record, the CFTC wrote:

> The ALJ's abuse of discretion in considering legal issues that were either never raised or were raised and subsequently dropped mandates vacation of findings related to these issues. Moreover, the ALJ's assessment of the facts material to Dr. Morris' claims is so intertwined with his consideration of irrelevant issues that we cannot say with con-

fidence that he weighed the evidence in a reliable manner. Our skepticism is compounded by the judge's decision to venture significantly beyond the record, drawing inferences based on pure conjecture.

In the portions of its ruling relevant to this appeal, the CFTC concluded that (1) Morris' fraudulent inducement claim was not supported by the evidence, primarily because he had waived his right to challenge Greenfield's registration status,[1] and (2) Morris' churning claim could not be sustained because he failed to establish that Greenfield had de facto control over the trading in his account.

## II. STANDARD OF REVIEW

On appeal to this court, the factual findings of the CFTC are conclusive "if supported by the weight of evidence." 7 U.S.C. § 9. This circuit interprets the "weight of the evidence" standard to be equivalent to a preponderance of the evidence test. *Dohmen–Ramirez v. CFTC*, 837 F.2d 847, 856 (9th Cir.1988). We do not mechanically reweigh the evidence to ascertain which way it "preponderates," however, but instead " 'review the record with the purpose of determining whether the finder of the fact was justified, *i.e.* acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings.' " *Haltmier v. CFTC*, 554 F.2d 556, 560 (2d Cir.1977) (quoting *Great Western Food Distribs., Inc. v. Brannan*, 201 F.2d 476, 479–80 (7th Cir. 1953); *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163–64 (8th Cir.1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135

---

**1.** At the time he solicited Morris' business, Greenfield was not properly registered under the Commodity Exchange Act. While there was no causal relationship between Greenfield's lack of registration and Morris' trading losses, the ALJ concluded that Greenfield fraudulently induced Morris to open his account with Stotler & Co. Even though Stotler & Co. was properly registered, Greenfield never informed Morris that he was not himself registered, although required to be. In this context, Greenfield's failure to reveal his own registration status would be a material misrepresentation. *See Hall v. Paine Webber Jackson & Curtis, Inc.*, [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,317 at 32,889 (CFTC Oct. 8, 1986) ("The fact that the individual making the solicitation is unregistered, and is thereby acting unlawfully, is a material fact because it is substantially likely that a reasonable investor would consider the matter important in making an investment decision.") (citations omitted).

(1972)); *see also Dohmen–Ramirez,* 837 F.2d at 856.

 It is "the decision of the Commission, not that of the ALJ, that is subject to judicial review." *Drexel Burnham Lambert v. CFTC,* 850 F.2d 742, 747 (D.C.Cir. 1988). "[W]hen, as in the instant case, the Commission and an ALJ disagree on factual inferences to be drawn from the record, the Supreme Court has told us that the question to be decided is *not* whether the agency has 'erred' in 'overruling' the ALJ's findings, but whether its *own* findings are reasonably supported on the entire record." *Id.* Still, while we review the decision of the CFTC, the ALJ's decision is not to be ignored; this court may review the ALJ's findings as part of the record to determine if the CFTC's decision is supported by the weight of the evidence. *See Bosma v. Department of Agric.,* 754 F.2d 804, 808 (9th Cir.1984). Agency findings which run counter to those of the ALJ "are given less weight than they would otherwise receive." *Saavedra v. Donovan,* 700 F.2d 496, 498 (9th Cir.1983); *Bosma,* 754 F.2d at 808 (agency's findings will be scrutinized more critically if they contradict those of the ALJ). This is especially true when the issue involves the determination of witness credibility, since the ALJ has the opportunity to observe the witnesses' demeanors, and is in a better position to judge certain facts. *Id.; see also Dohmen–Ramirez,* 837 F.2d at 856.

As to the CFTC's application of law to the facts, two standards appear to coexist: one involving great deference to the agency's conclusions under a reasonableness or rational basis standard of review, and the other involving far less deference and more probing judicial scrutiny under a type of de novo review. *See Maloley v. R.J. O'Brien & Assocs., Inc.,* 819 F.2d 1435, 1440–41 (8th Cir.1987). In determining which of the two levels of scrutiny should be applied, courts generally look to (a) the nature of the question to be decided, and (b) a comparison of the respective qualifications and competence of the decisionmakers at issue. *Id.* Where the question to be decided involves matters of particular expertise of the agen-

cy, the deferential standard should be applied. *See CFTC v. P.I.E., Inc.,* 853 F.2d 721, 724 (9th Cir.1988) (great deference applied regarding CFTC's definition of a "leverage contract"). But judicial deference is not necessarily warranted where courts have experience in the area and are fully competent to decide the issue. *See Maloley,* 819 F.2d at 1441 (no reason for judicial deference where question falls outside the area generally entrusted to the agency); *Hi–Craft Clothing Co. v. NLRB,* 660 F.2d 910, 915 (3d Cir.1981) (judicial deference not required in areas where "the courts have special competence, i.e., the common law or the constitutional law"). In those situations, the more probing de novo standard is appropriate.

## III. VALIDITY OF THE CFTC's RULING UNDER THE A.P.A.

 At the outset, we reject Morris' argument that the CFTC's order was invalid under Section 557(c) of the A.P.A. Essentially, Morris claims that because only four of the five CFTC commissioners participated in the decision in his case, and because Commissioner Hinemann, one of the three commissioners in the majority, concurred only in the result without providing a written statement of his position, only two of the five-person CFTC articulated their rationale for reversing the decision and voted to reverse.

Section 557(c) provides in relevant part: "All decisions ... shall include a statement of (A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record...." 5 U.S.C. § 557(c). Despite Morris' broad citation to section 557, the A.P.A. does not require that each member of an agency articulate his particular view on each matter. *See Public Serv. Comm'n v. Federal Power Comm'n,* 543 F.2d 757, 777 (D.C.Cir.1974) ("[I]n each instance, what counted in the definition of agency action was the vote rather than the individual view."). Here, all that was required was that three of the four members of the CFTC participate in the case and

agree to reverse the decision of the ALJ. *See FTC v. Flotill Prods., Inc.*, 389 U.S. 179, 183–84, 88 S.Ct. 401, 404, 19 L.Ed.2d 398 (1967) (stating the general rule that "a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body."). That is precisely what occurred: Chairman Gramm, and Commissioners Albrecht and Hinemann agreed to reverse, while Commissioner West dissented and Commissioner Bair did not participate. Morris ignores the fact that Commissioner Hinemann did vote to "concur in the result"—that result being reversal of the ALJ's ruling.

The majority opinion sufficiently articulated the reasons for the CFTC's reversal of the ALJ's initial decision. The mere fact that Commissioner Hinemann chose to concur separately does not transform the CFTC's otherwise valid agency action into a violation of the A.P.A.

## IV. FRAUDULENT INDUCEMENT

■ The CFTC reversed the ALJ's decision in favor of Morris on his fraudulent inducement claim after finding that Morris had waived the pivotal issue of Greenfield's registration status by failing to raise it in his complaint or his post-hearing brief. Without the registration issue, the CFTC noted that Morris' fraudulent inducement claim was reduced to a claim that Greenfield touted his expertise in futures trading and the services available through Stotler as better than those Morris had received from Modoc, the firm where Morris had already lost considerable funds trading precious metals. The CFTC concluded that this reduced claim was not supported by the weight of the evidence because, regardless of Morris' subjective perception of Greenfield's comments, no "reasonable potential investor" would have understood the remarks as deceptive or as a guarantee against loss. First, we note that the CFTC's waiver conclusion is not entitled to substantial deference from this court because it does not involve an area within the agency's particular expertise. Instead, the waiver issue raises the type of legal question this court has confronted before in

varied contexts, and is competent to answer here. Nonetheless, after review of the record, we agree with the CFTC's waiver analysis and find the CFTC's conclusion justified even under this more probing judicial review.

The CFTC's waiver conclusion was based upon factual findings pertaining to several of Morris' "procedural lapses," including (1) his failure to articulate the registration claim as a basis for relief in his complaint, and (2) his admission at the hearing before the ALJ that the registration issue was not one of his bases for seeking damages. We conclude that these findings are supported by the weight of the evidence. First, Morris' reparations complaint fails to allege specifically that he was fraudulently induced due to Greenfield's failure to tell Morris that he was unregistered. Further, Morris does not dispute that he never amended his complaint to raise the issue nor did he raise it in his post-hearing brief. Second, at the hearing before the ALJ, Morris' counsel acknowledged that he was "not directly" relying on the registration issue as a claim for damages. Notwithstanding Morris' procedural errors, the ALJ considered the issue on its own, reviewing Greenfield's registration status and determining that Greenfield was not registered during the period he was working on Morris' account.

In reversing the ALJ's fraudulent inducement finding of liability, the CFTC correctly relied upon the well-established principle that an ALJ abuses his or her discretion by *sua sponte* adjudicating theories of recovery independent from those raised directly or indirectly by the complainants, especially where the parties are represented by counsel. *See Marvin v. First Nat'l Monetary Corp.*, [Current Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,046, at 37,910 (CFTC April 17, 1991); *Johnson v. Fleck*, [Current Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 24,957, at 37,499–500 (CFTC Nov. 20, 1990). Fundamental fairness requires "that commodity professionals be given adequate notice of the legal violations at issue in a reparations proceeding." *Johnson v. Fleck*, [Current Transfer Binder] Comm.Fut.L.Rep. (CCH) at 37,499.

While an ALJ has broad discretion in presiding over disputes, the ALJ's proper adjudicatory role "focuses on the resolution of the parties' dispute rather than the embellishment or reinterpretation of that dispute." *Id.* (emphasis omitted). The ALJ abuses his or her discretion when the ALJ, rather than the parties, is the "primary source of the specific legal dispute resolved in the initial decision." *Id.* at 37,500. Review of the record on appeal convinces us that given Morris' procedural lapses, the CFTC correctly found that the ALJ was the primary source of the registration issue, having abused his discretion by improperly injecting that unpleaded, unargued issue into the case.

Notwithstanding the merits of a potential fraudulent inducement claim based on Greenfield's unregistered status, Morris' failure adequately to present that issue before the ALJ supports the CFTC's conclusion that the issue was waived.

## V. CHURNING

▮▮▮ Churning of a futures trading account is a recognized form of fraud actionable under § 4b of the Commodity Exchange Act. *See Bowley v. Stotler & Co.,* 751 F.2d 641, 644 (3d Cir.1985). To establish a claim for churning, "a complainant must not only show that his account was traded excessively in light of his objectives, he must also show that the trading was controlled by the broker." *Secrest v. Madda Trading Co.,* [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,627 at 36,-696 (CFTC Sept. 14, 1989). The ALJ found that Morris had proved both of these elements. Distrusting the ALJ's fact-finding, the CFTC engaged in an independent review of the record and concluded that Morris had not shown that Greenfield exercised "de facto control" over trading in his non-discretionary account. We hold that the CFTC's finding that Greenfield did not have de facto control over the level and frequency of trading in Morris' account is supported by the weight of the evidence.

The de facto control analysis is factually intensive, involving the examination of seven factors pertaining to the relationship between the parties: (1) lack of customer sophistication; (2) lack of prior commodity trading experience on the part of the customer; (3) minimum amount of time devoted by the customer to the account; (4) high degree of trust and confidence reposed in the broker by the customer; (5) large percentage of transactions entered into by the customer based upon the broker's recommendation; (6) absence of prior customer approval for transactions entered into on his behalf; and (7) customer's approval of recommended transactions where approval is not based upon full, truthful and accurate information. *See Gatens v. International Precious Metals Corp.,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,636, at 30,706 (CFTC June 18, 1985); *Secrest,* [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) at 36,701 n. 18. While the presence of these factors will suggest that a customer has surrendered de facto control to his broker, a finding of control "does not require the presence of all the above factors, and the probative value of any particular factor will depend upon the facts and circumstances of individual cases." *Gatens,* [1984–1986] Comm. Fut.L.Rep. (CCH) at 30,706.

In this case, the ALJ and CFTC simply disagreed in their application of the fact-based test: the ALJ interpreted the balance of factors tipping in favor of Greenfield's de facto control, and the CFTC tipping against. It is not this Court's job to reweigh the evidence, but instead to review whether the CFTC's finding on the issue was reasonable and justified, supported "by the weight of the evidence."

In rejecting Morris' claim that he had surrendered de facto control of his account to Greenfield, the CFTC focused upon factors one and three, finding that Morris failed to prove that he lacked the sophistication or the time necessary to evaluate Greenfield's suggestions. The CFTC determined that Morris had "sufficient financial acumen" to assess independently his broker's recommendations, noting that his "professional education" in medicine and his "investment and business experience" was in sharp contrast with those previously deemed unsophisticated for purposes of the

de facto control test. *See Lehman v. Madda Trading Co.,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,417 (CFTC Nov. 13, 1984) (self-employed TV repairman); *Gatens v. International Precious Metals Corp.,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,636 (CFTC June 18, 1985) (laborer/blast furnace operator with only high school education, and shirt presser/cleaning woman); *DeAngelis v. Shearson/American Express, Inc.,* [1984–1986 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 22,753 (CFTC Sept. 30, 1985) (tailor with only high school education).

Additionally, the CFTC rejected the ALJ's finding that Morris was "too busily engaged in medical affairs to attend to an investment in such volatile markets as precious metals and futures contracts," noting that Morris "took the time to independently monitor the gold and silver markets" and to make time to speak with Greenfield about the account virtually "on a daily basis."

We conclude that the weight of the evidence supports the CFTC's finding that Morris, and not Greenfield, was "the person primarily responsible for the level of trading in the account." *See Secrest,* [1987–1990 Transfer Binder] Comm. Fut.L.Rep. (CCH) at 36,700. While some of the de facto control factors tip the balance in one direction and some the other, this court has stated that the "touchstone is whether or not the customer has sufficient intelligence and understanding to evaluate the broker's recommendations and to reject one when he thinks it unsuitable." *Follansbee v. Davis, Skaggs & Co., Inc.,* 681 F.2d 673, 677 (9th Cir.1982). Thus, the CFTC was justifiably persuaded by Morris' business experience and high level of intelligence, and the fact that he monitored the market, kept in almost daily contact with his broker, and actually rejected a number of Greenfield's suggestions. Even though

broker control may be inferred from the broker-customer relationship, " 'a customer retains control of his account if he has sufficient financial acumen to determine his own best interests,' " even if he acquiesces in the broker's management of the account.[2] *Follansbee,* 681 F.2d at 677 (quoting *Carras v. Burns,* 516 F.2d 251, 258–59 (4th Cir.1975)). We therefore conclude that the CFTC's finding that Morris maintained control over his account is supported by the weight of the evidence. Since Morris had not relinquished de facto control of the account, the CFTC justifiably concluded that his churning claim could not be sustained.

AFFIRMED.

---

**2.** This is not to say that a sophisticated customer who blindly defers to his broker is necessarily in control of his account. *See Tiernan v. Blyth, Eastman, Dillon & Co.,* 719 F.2d 1, 3–4 n. 2 (1st Cir.1983) ("even a sophisticated investor who blindly relinquishes all decisions to a broker may not be in control of his account."). Nonetheless, the record in this case does not support such "blind relinquishment," especially given Morris' rejection of some of Greenfield's suggestions.